Cameron M. Hancock, #5389
Jackie Bosshardt Wang, #14139
**KIRTON McCONKIE**
Kirton McConkie Building
50 East South Temple, 4th Floor
P.O. Box 45120
Salt Lake City, Utah 84145-0120
Telephone:  (801) 328-3600
Facsimile:  (801) 321-4893
chancock@kmclaw.com
jwang@kmclaw.com

*Attorneys Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, <br><br> Plaintiff, <br> v. <br><br> DATABANK HOLDINGS, Ltd, a Texas corporation, <br><br> Defendants. | **COMPLAINT FOR DECLARATORY JUDGMENT** <br><br> Case No. _____ <br><br> Judge _____ |

Plaintiff, The Church of Jesus Christ of Latter-day Saints ("Church Corporation"),

through counsel, respectfully submits this Complaint for Declaratory Relief.  The Church

Corporation is not seeking any monetary relief or financial judgment from DataBank Holdings,

Ltd ("DataBank" or "Defendant") and merely asks the Court for an order resolving a dispute as

to the amount owed pursuant to a contract, including offsets for amounts paid by the Church

Corporation, breach by DataBank, and any damages to the Church Corporation caused by

DataBank.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, The Church of Jesus Christ of Latter-day Saints is a Utah corporation sole with its principal place of business in Utah.

2.     On information and belief, Defendant DataBank Holdings, Ltd is a Texas corporation with its principal place of business in Texas.

3.     C7 Data Centers, Inc. ("C7") is a DBA name for nonparty C7 Data Centers, LLC, a Utah limited liability company with its principle place of business in Utah.

4.     The dispute relates to a contract.  An actual controversy exists between the Parties regarding the amount, if any, owed to Defendant.

5.     The amount in controversy is over $75,000 because Defendant has alleged and demanded over $75,000 in connection with the contract.

6.     This court has jurisdiction over this matter pursuant to 28 USC § 1332 due to complete diversity of the parties and amount in controversy.

7.     This action relates to a contract that was negotiated in Utah, between parties located in Utah, related to a Data Center (defined below) located in Utah.

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

9.     On or about March 4 and March 11, 2014, the Church Corporation and C7 negotiated and entered into a Master Services Agreement ("MSA") and Statement of Work ("SOW," collectively, the "Agreements") under which C7 agreed to (a) provide space in a secure data center located at 179 E. Social Hall Ave., Suite 200; Salt Lake City, UT 84111 ("Data Center") in which the Church Corporation could house various computer hardware, including servers and

2

various other items and equipment, and (b) to provide internet connectivity and other services associated with such use._

10.    The negotiations and execution of the Agreements occurred in Utah.

11.    Though signed in March, the SOW's start date was February 15, 2014.

12.    Upon information and belief, in approximately January 2017, Defendant DataBank purchased the assets of C7 and purported to become the successor in interest to the Agreements, subject to all duties, obligations, and rights under the agreement.

13.    As purported successor to the Agreements, DataBank agreed that the Data Center would include secure infrastructure, services, and tools that would allow the Church Corporation to monitor and manage various computer hardware and servers.

14.    The Data Center included cabinet space, internet bandwidth, cooling and fire suppression systems, video monitoring, and secure access for Church Corporation property stored on the site.

15.    DataBank guaranteed 101Mbps redundant bandwidth with burstable capacity to 300 Mbps.  (SOW at ¶ 1.2).  The parties anticipated this would be sufficient internet bandwidth to handle the traffic on the Church Corporation's servers.

16.    DataBank guaranteed that, at a minimum, the Church Corporation would have access to the Data Center, internet, and Data Center services 99.99% of the time on a 24x7x365 basis except for scheduled maintenance.  (SOW at 1.3).

17.    The Data Center included power and a cooling system that would allow the Church Corporation's servers to function at optimal levels.  (SOW at ¶¶ 1.3, 1.5).

4838-1977-4384

18.    The Church Corporation agreed to pay a monthly fee that included a set-up fee amortized over 60 months and costs based on the amount of power the Parties anticipated the Church Corporation would use.

19.    Paragraphs 4.1 through 4.4 of the MSA provided that undisputed payments are due within thirty days and that the Church Corporation could withhold disputed payment without being deemed in breach.

20.    The Agreements anticipated an initial term of five years.  SOW at ¶ 3.2; MSA at ¶ 7.1.

21.    Paragraph 7.1 of the MSA provided that the SOW would automatically renew unless the Church Corporation provided ninety days' notice of an intent to terminate.  SOW at ¶ 7.1.

22.    Paragraph 8.1 of the MSA provided that C7, DataBank's successor, could not assign or transfer the Agreements without prior written consent of the Church Corporation.

23.    On information and belief, C7 did not seek or obtain the Church Corporation's consent before assigning or transferring the Agreements to DataBank.

24.    Paragraphs 9.1 and 9.2 of the MSA required DataBank to obtain and maintain insurance protection for the Church Corporation in the amount of $1,000,000 to $2,000,000, and to provide the Church Corporation with certificates of insurance.

25.    Exhibit A of the SOW required DataBank to obtain and maintain cybersecurity liability insurance with a minimum limit of $1,000,000 listing the Church Corporation as a certificate holder and provide the Church Corporation with a copy of the certificate.

26.    Insurance requirements for the benefit of the Church Corporation were important and material terms to the agreement.

27.     Upon information and belief, DataBank did not obtain or maintain certificates of insurance listing the Church Corporation as a certificate holder.

28.     Upon information and belief, DataBank did not obtain or maintain the insurance at the amounts required by the Agreements.

29.     In the implementation of the Agreements, the Church Corporation discovered that it did not require the amount of space and power that it originally anticipated in the Agreements to house, power, or cool its computer systems.  Thus, the Church Corporation did not utilize all of the space and power it had contracted for.

30.     In 2017, the Church Corporation and DataBank began to renegotiate the terms of the SOW to reduce the Church Corporation's footprint, to reduce power and bandwidth, to shorten the contract period, and correspondingly, to reduce the monthly price.

31.     In September 2017, DataBank asked Church Corporation employees to "loan" back to DataBank a pair of power circuits that DataBank would offer to a different client.  DataBank offered to credit the Church Corporation 17 KWHs, a credit of $2,234.82 per month beginning November 2017 ("Power Credits").

32.     Church Corporation employees agreed to the proposal and, on information and belief, changes were made to the Data Center.

33.     Nonetheless, DataBank continued to bill the Church Corporation at the full monthly rate without giving the agreed upon Power Credits.

34.     The Parties continued to negotiate a reduction in the Data Center's footprint, bandwidth, power costs, and length of the contract throughout 2018 and into 2019.

4838-1977-4384

35.    Upon information and belief, in the course of negotiating a new agreement, Church Corporation employees notified DataBank at least 90 days before the renewal date that the Church Corporation did not intend to renew the existing Agreements on the same terms.

36.    In January or February 2019, the Church Corporation completed its obligation to pay the set-up fee, which had been amortized to nearly $9,000 per month.

37.    Nonetheless, DataBank continued to bill the Church Corporation for the set-up fee, even though it had been paid in full.

38.    On February 12, 2019, a DataBank manager confirmed in an email that the contract termination date was 2/15/2019 and that the Church Corporation did "not have to worry about it auto-renewing since we have been discussing the reduction of your footprint and the subsequent renewal for months."  A copy of this email is attached hereto as Exhibit A.

39.    Starting on February 15, 2019, pursuant to the parties' agreement and understanding during the negotiations, the parties began operating on a month-to-month basis.

40.    As negotiations continued, and as the parties came closer to a new arrangement, Church Corporation requested that the new agreement be backdated to February 2019, the date the old Agreements terminated.  DataBank explained in an email that it could not backdate the new/amended agreement because "[w]e have been operating under the current contract on a month to month basis until the new one is in place."  A copy of this email is attached hereto as Exhibit B.

41.    Negotiations on a new agreement continued through the spring and summer.

42.    DataBank continued to send monthly invoices that did not reflect the agreement regarding the Power Credits, the fact the Church Corporation had fully paid the set-up fee, the

Church Corporation's actual use of the Data Center's space and services, or the terms that were being negotiated.

43.     The Church Corporation disputed the invoices.

44.     In May 2019, the Church Corporation stopped paying the disputed invoices in anticipation of receiving credits and the parties executing a new agreement at a lower price.

45.     In July, DataBank offered a credit of the amortized set-up fee for April through July, but not for February or March.  DataBank did not address the Power Credits.

46.     On Wednesday, August 21, 2019, at approximately 2:35 pm, DataBank informed the Church Corporation that a credit hold would be issued soon due to the unpaid invoices. DataBank promised credit for any discounts when the new contract was signed.

47.     Approximately thirty minutes later, the Church Corporation received a "NOTICE OF CREDIT HOLD" giving the Church Corporation ten business days to pay the invoices to avoid "further action".

48.     Less than five hours later, a Church Corporation employee went to work at the Data Center in preparation for a worldwide broadcast event scheduled for Friday and discovered that DataBank had locked Church Corporation employees out of the Data Center, preventing them from accessing the Church Corporation's own servers and equipment that were critical to the worldwide broadcast for broadcast encoding.

49.     Church Corporation employees repeatedly called and emailed DataBank, but DataBank ignored all communication from the Church Corporation.

50.     The Church Corporation could not reasonably obtain and update other computer equipment in time for the global broadcast event.

4838-1977-4384

51.   The Church Corporation informed DataBank that the lockout was causing irreparable harm due to the need to prepare for the global broadcast event.

52.   On Thursday August 22, the Church Corporation informed DataBank that it had authorized and initiated wire transfers to pay the invoices under protest.

53.   DataBank did not lift the lockout.

54.   At approximately 8 am on August 23, a Church Corporation manager asked onsite DataBank personnel to bring him his laptop from his office in the Data Center.  DataBank personnel refused the request, citing the lockout.

55.   At approximately 10 am on August 23, DataBank finally lifted the lockout.

56.   DataBank's lockout and denial of access to the Data Center breached the Agreements' guarantee of 99.99% access on a 24/7/365 basis.

57.   DataBank's lockout and denial of access came only a few hours after DataBank promised to give the Church Corporation ten business days before taking further action.

58.   DataBank's lockout, denial of access, broken promise, and refusal to respond to inquiries at a critical time destroyed all goodwill and trust DataBank once had with the Church Corporation.

59.   On August 22, 2019, the Church Corporation notified DataBank that it was terminating the month-to-month terms under which the parties had been operating and that it would vacate the Data Center by November 30, 2019.

60.   DataBank did not respond to the notice to terminate.

61.   On September 20, 2019, the Church Corporation informed DataBank of the need to resolve a dispute over the final invoice and reminded DataBank that it would vacate the Data Center on or before November 30, 2019.

4838-1977-4384

62.   The parties have attempted to negotiate the final amount owed by the Church Corporation and have been unable to settle on the appropriate amount.  The Church Corporation believes it owes nothing due to the prior breaches by DataBank, damages caused by DataBank, reduction in space, costs saved by DataBank, and because the Church Corporation overpaid the previous disputed invoices.  Nonetheless, as a demonstration of good faith and in an attempt to resolve the dispute amicably, it has made reasonable offers to DataBank.  DataBank has refused the offers and alleges the Church Corporation owes more than $75,000.

## FIRST CAUSE OF ACTION
### (Declaration that the Termination Notice was Valid)

63.   The Church Corporation incorporates the allegations in the preceding paragraphs as if fully stated herein.

64.   A justiciable controversy has arisen between DataBank and the Church Corporation as to the amounts owed under a contract.

65.   The parties entered into the MSA and SOW in March 2014 where the Church would pay a monthly amount in exchange for services allowing the Church Corporation to house various computer hardware, including servers and various other items and equipment, at a secure location with internet connectivity, sufficient power, and access to other associated services.

66.   DataBank agreed to credit the Church Corporation for 17 KWH ($2,234.82) per month beginning November 2017 ("Power Credits").  DataBank did not give the Church Corporation the promised Power Credits.

67.   The parties began operating under the SOW on a month-to-month basis on February 15, 2019.

4838-1977-4384

68.    In January or February 2019, the Church Corporation completed payments on the amortized portion of the start-up fee.

69.    In July, DataBank granted a credit for overpayments in April through July, but not March.

70.    DataBank continued to send invoices charging the Church Corporation for the fully paid, amortized portion of the set-up fee.

71.    On August 22, 2019, the Church Corporation notified DataBank of its intent to terminate the SOW and vacate the Data Center by November 30, 2019.

72.    The notification provided sufficient notice to terminate the month-to-month SOW.

73.    The Church Corporation paid all invoices, including disputed amounts, through October 31, 2019.

74.    Through diligence, the Church Corporation vacated the Data Center as of October 31, 2019, earlier than the date anticipated in the termination notice.

75.    The Church Corporation attempted to pay DataBank for use in November (even though the Church Corporation vacated the space) minus the Power Credits, but DataBank rejected the payment.

76.    DataBank has alleged the Church Corporation owes more than $75,000.

77.    An actual controversy exists between the Parties regarding the amount, if any, owed to Defendant.

78.    The Church Corporation is entitled to declaratory judgment that the SOW became a month-to-month contract in February 2019, the notice sent by the Church Corporation on August 22 was sufficient to terminate the SOW, the invoice for services from November 1 to 30, 2019 is

4838-1977-4384

the final invoice, the set-up fee was paid in full, and the final invoice should be reduced by the amount of the Power Credits, overpayments, and any other offsets or credits.

### SECOND CAUSE OF ACTION
**(In the Alternative, DataBank's Material Breaches terminated the Agreements)**

79.    The Church Corporation incorporates the allegations in the preceding paragraphs as if fully stated herein.

80.    The Agreements were enforceable contracts covering the time period of February 15, 2014 to February 15, 2019 and then continuing on a month-to-month basis until terminated by the Church Corporation, effective November 30, 2019.

81.    The Church Corporation complied with all material terms of the Agreements.

82.    The Church Corporation disputed DataBank invoices beginning in spring 2019 because both its footprint and its use of power had been greatly reduced, DataBank acknowledged the reduction, the Church Corporation was entitled to credits, and DataBank was delaying formalization of a replacement agreement.

83.    The Church Corporation was only required to pay undisputed invoices and had a right to withhold payment on disputed charges under MSA ¶ 4.0.

84.    Under MSA ¶ 4.4, the Church Corporation is not required to pay disputed charges

85.    Under SOW ¶ 1.3, DataBank guaranteed Data Center availability 99.99% of the time on a 24x7x365 basis except for scheduled maintenance.

86.    On August 21, 2019, DataBank demanded payment on disputed invoices and gave the Church Corporation ten days to pay before DataBank would take further action.

4838-1977-4384

87.    On August 21, 2019, DataBank denied the Church Corporation access to its own equipment at the Data Center only a few hours after promising to wait ten days before taking further action.

88.    On information and belief, there was no maintenance scheduled for the week of August 21, 2019.

89.    DataBank did not restore access for multiple days, in breach of its express promise.

90.    DataBank did not restore access for multiple days, in breach of SOW ¶ 1.3.

91.    DataBank executed the lockout just a few days before a global broadcast event that required the servers and computer equipment located in the Data Center knowing that the Church Corporation would have no time to make arrangements to use other equipment.

92.    DataBank used the lockout to force the Church Corporation to pay the disputed charges, despite its rights under the Agreements to withhold payment.

93.    DataBank breached the Agreements by requiring the Church Corporation to pay disputed charges.

94.    Paragraphs 9.1 and 9.2 of the MSA required DataBank to obtain insurance protection for the Church Corporation in the amount of $1,000,000 to $2,000,000, and to provide the Church Corporation with certificates of insurance.

95.    Exhibit A of the SOW required DataBank to obtain cyber liability insurance with a minimum limit of $1,000,000 listing the Church Corporation as a certificate holder and provide the Church Corporation with a copy of the certificate.

96.    Cybersecurity is a critical issue and cyber insurance was a material requirement of the SOW.

4838-1977-4384

97.    On information and belief, DataBank did not obtain insurance, whether general or cyber liability for the benefit of the Church Corporation, in material breach of the Agreements.

98.    On information and belief, DataBank did not obtain the required certificates of insurance listing the Church Corporation as a certificate holder, in material breach of the Agreements.

99.    On information and belief, DataBank did not obtain insurance at the amounts required by the Agreements, in material breach of the Agreements.

100.  Each of DataBank's material breaches terminated the Agreements and excused the Church Corporation from further performing.

101.  The combination of DataBank's material breaches terminated the Agreements and excused the Church Corporation from further performing.

102.  The Church Corporation's notification on August 22, 2019 limited any additional performance to the period ending November 30, 2019, as indicated in the notice.

103.  The Church Corporation paid all amounts, including disputed amounts, through October 31, 2019.

104.  The Church Corporation is entitled to declaratory judgment that the Agreements terminated effective November 30, 2019, the set-up fee was paid in full, and the final invoice should be reduced by the amount of the Power Credits, overpayments, and any other offsets or credits.

### **THIRD CAUSE OF ACTION**
**(In the Alternative, DataBank's Breach of the Duty of Good Faith and Fair Dealing Terminated the Agreements)**

105.  The Church Corporation incorporates the allegations in the preceding paragraphs as if fully stated herein.

13

106.  The Church Corporation complied with all material terms of the Agreements.

107.  In Utah, an implied covenant of good faith and fair dealing generally inheres to all contractual relationships.

108.  Under that covenant, each party impliedly promises that it will not do anything that will interfere with the other party's reasonable expectations under the contract or injure the other party's right to receive the benefits under the contract.

109.  DataBank breached the duty of good faith and fair dealing by promising to give the Church Corporation ten days to pay outstanding invoices before taking further action and then preventing the Church Corporation from accessing their leased space only a few hours later.

110.  DataBank breached the duty of good faith and fair dealing by issuing a lockout only two days before a scheduled, global event that required use of the equipment at the Data Center.

111.  DataBank breached the duty of good faith and fair dealing by refusing to respond to inquiries from the Church Corporation regarding the lockout.

112.  DataBank breached the duty of good faith and fair dealing by refusing to grant access until it had forced the Church Corporation to pay all disputed invoices in full, even though the Agreements give the Church Corporation the right to withhold payment on disputed invoices.

113.  DataBank's breach of the implied covenant of good faith and fair dealing terminated the Agreements and excused the Church Corporation from further performing.

114.  The Church Corporation's notification on August 22, 2019 limited any additional performance to the period ending November 30, 2019, as indicated in the notice.

115.  The Church Corporation paid all amounts, including disputed amounts, through October 31, 2019.

14

116.  The Church Corporation is entitled to declaratory judgment that the invoice for November 1 to 30, 2019 is the final invoice and the Church Corporation is entitled to credits and offsets.

### FOURTH CAUSE OF ACTION
#### (In the Alternative, the Autorenewal Clause was Void)

117.  The Church Corporation incorporates the allegations in the preceding paragraphs as if fully stated herein.

118.  Utah Code § 15-10-201 and -202 provides that automatic renewal provisions in service contracts are void as against public policy unless the automatic renewal provision is prominently displayed on the first page of the service contract.  Utah Code § 15-10-201(2)(a).

119. Section § 15-10-202(2)(b) requires the service provider to give the other party notice of the renewal provision between 30 and 90 days prior to the notice deadline.

120.  Contracts that do not comply with the requirements of Utah Code § 15-10-102 et seq. renew on a month-to-month basis.

121.  "Service contract" includes a contract for service, maintenance, or repair in connection with real property or that benefits the real property.  Utah Code § 15-10-102.

122.  Paragraph 1.12 of the MSA expressly provides that the Agreements are service agreements in connection with the use of space in a Data Center and associated utilities and internet connectivity.

123.  The Agreements were contracts for service, maintenance, or repair in connection with real property, and thus, are subject to the requirements of Utah Code § 15-10-201 et seq.

124.  The Agreements did not have the automatic renewal provision prominently displayed on the first page.

4838-1977-4384

125.  DataBank did not provide notice of the renewal provision between 30 or 90 days prior to the notice deadline.

126.  Thus, the Agreements did not renew for an additional five-year term, but continued only on a month-to-month basis, as Data Bank itself acknowledged in the email attached hereto as Exhibit B.

127.  On August 22, 2019, the Church Corporation notified DataBank of its intent to terminate the SOW and vacate the Data Center by November 30, 2019.

128.  The Church Corporation's notification provided sufficient notice to terminate the month-to-month SOW.

129.  The Church Corporation paid all invoices, including disputed amounts, through October 31, 2019.

130.  Therefore, the Church Corporation is entitled to declaratory judgment that the Agreements were month-to-month contracts, the notice sent by the Church Corporation on August 22 was sufficient to terminate, and any outstanding amount must be reduced by the Power Credits, overpayments, and any other credits or offsets.

## FIFTH CAUSE OF ACTION
### (In the Alternative, the Agreements were void for failure to obtain consent)

131.  The Church Corporation incorporates the allegations in the preceding paragraphs as if fully stated herein.

132.  Paragraph 8.1 of the MSA prohibited DataBank's predecessor from assigning or transferring the Agreements without prior written consent of the Church Corporation.

4838-1977-4384

133.  On information and belief, C7 did not seek or obtain the Church Corporation's consent before assigning or transferring the Agreements to DataBank, making the transfer void and of no effect.

134.  Without a validly transferred contract, the relationship between DataBank and the Church Corporation was month to month and governed by their course of dealing.

135.   On August 22, 2019, the Church Corporation notified DataBank of its intent to terminate the SOW and vacate the Data Center by November 30, 2019.

136.  The Church Corporation vacated the Data Center as of October 31, 2019.

137.  The Church Corporation paid all amounts, including disputed amounts, through October 31, 2019.

138.  The Church Corporation is entitled to declaratory judgment that the Agreements terminated as of November 30, 2019 and any amount owed must be reduced by the Power Credits, overpayments, and any other credits or offsets.

## SIXTH CAUSE OF ACTION
### (In the Alternative, Offsets)

139.  The Church Corporation incorporates the allegations in the preceding paragraphs as if fully stated herein.

140.  The parties began operating under the Agreements on a month to month basis in February 2019, and the Church Corporation provided effective notice that the Agreements would terminate as of November 30, 2019.

141.  In the alternative, if the Court finds the Agreements did not terminate as of November 30, 2019, the Church Corporation is entitled to offsets against DataBank for cooling credits, power credits, overpayments on disputed invoices, costs not incurred by DataBank, the cost of

4838-1977-4384

maintaining insurance at levels required by the Agreements, income from DataBank's new tenant, and other potential credits or offsets.

142.  In addition, if the Court finds the Agreements did not terminate as of November 30, 2019, the Church Corporation is entitled to offsets against DataBank for the various contractual breaches by DataBank outlined in the preceding paragraphs, including breach of the covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

WHEREFORE, the Church Corporation requests Judgment and Relief against DataBank as follows:

1.      For judgment declaring that the SOW became month-to-month in February 2019 and that the Church Corporation's notice on August 22, 2019 effectively terminated the SOW effective November 30, 2019.

2.      In the alternative, for judgment declaring that the Agreements were month to month for failure to comply with Utah Code § 15-10-102 et seq.

3.      In the alternative, for judgment declaring that DataBank's material breaches of the Agreements and breach of the covenant of good faith and fair dealing gave the Church Corporation the right to terminate and released the Church Corporation of further obligation under the Agreements except as to the Church Corporation's notice and agreement to continue through November 30, 2019.

4.      In the alternative, for judgment declaring that C7's attempt to transfer the Agreements to DataBank was null and void for failure to comply with the terms of the Agreements regarding transfer and assignment.

5.      Offsets against any amounts owed to DataBank.

4838-1977-4384

Dated:  January 17, 2020.

        KIRTON McCONKIE


        /s/Cameron M. Hancock
        Cameron M. Hancock
        Jackie Bosshardt Wang
        *Attorneys for Plaintiff*